**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER S., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:18-CV-0961-S-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

By *Special Order No. 3-251*, this social security appeal was automatically referred for full case management.  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for further proceedings.

## I.  BACKGROUND[1]

Christopher S. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act, and dismissing his request for hearing on his claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (doc. 1 at 1-2.)

### A.  Procedural History

On February 28, 2015, Plaintiff applied for DIB, alleging disability beginning on December 1, 2007.  (R. at 19, 142-43.)  His DIB claim was denied on May 28, 2015, and upon reconsideration

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

on August 7, 2015.  (R. at 76; 83.)  On May 28, 2015, Plaintiff applied for SSI, alleging disability beginning on his protected application date.[2]  (R. at 19-20.)  On September 29, 2015, he requested a hearing before an Administrative Law Judge (ALJ).  (R. at 106-07.)  He appeared and testified at a hearing on September 20, 2016.  (R. at 34-75.)  On December 13, 2016, the ALJ issued a decision finding Plaintiff was not under a disability from December 1, 2007 through December 31, 2012, and denying his claim for DIB benefits.  (R. at 19-28.)  He also dismissed Plaintiff's request for hearing on his SSI claim, finding no common issue with his DIB claim. (R. at 19-20.)

Plaintiff appealed the ALJ's decision to the Appeals Council on December 14, 2016.  (R. at 141.)  The Appeals Council denied his request for review on November 3, 2017.  (R. at 1-7.)  He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

B.    **Factual History**

1.    **Age, Education, and Work Experience**

Plaintiff was born on August 17, 1988, and was 28 years old at the time of the hearing.  (R. at 43-44.)  He graduated from high school, attended college, and could communicate in English.  (R. at 44, 167.)  He had past relevant work experience as a fast food worker.  (R. at 71.)

2.    **Medical Evidence**

Accompanied by his parents, Plaintiff presented to the Holiner Psychiatric Group (Holiner) with anxiety and depression on January 2, 2008, and was seen by Robert Feele, M.D.  (R. at 236-38.)  He was nineteen years old and attending college full-time but was home for the winter break.  (R.

---

[2]  A copy of Plaintiff's application for SSI benefits was not included in the record.  In his decision, the ALJ stated that Plaintiff applied for SSI benefits on May 28, 2015, and that the "protected filing date" for his SSI claim, which determines the disability onset date, was "May 28, 2015, or an unstated date in May 2015." (R. at 19-20.)  The Appeals Council referred to Plaintiff's request for hearing as whether he was disabled on or before February 28, 2015, which was the date of his DIB application.  (R. at 1-2.)  As explained below, this discrepancy in the dates does not impact the issues in this case.

at 236.)   He reported hearing telepathic messages from the neighbors for three months, but was doing "better" because he was being accepted by others.  (*Id.*)  He reported having suicidal thoughts three weeks before, but denied having those thoughts at the time of examination.  (*Id.*)  He also reported smoking marijuana daily. (*Id.*)

Dr. Feele reported Plaintiff's mood as dysphoric/irritable, anxious, and guilty/worthless, his concentration as "poor," and his motivation, energy, socialization, and interest levels as "fair."  (*Id.*) Plaintiff did not want to quit smoking marijuana because "[i]t expands [his] mind," but expressed a willingness to stop.  (R. at 237.)  During a mental examination, he was observed as having blunted affect, circumstantial thought process, grandiose delusions, dysphoric mood, and fair judgment and insight.  (R. at 238.)  Dr. Feele diagnosed Plaintiff with Schizophreniform, calculated a Global Assessment of Functioning (GAF) score of 50,[3] and prescribed 20mg of Zyprexa.  (*Id.*)

Plaintiff visited Dr. Feele on multiple occasions throughout 2008.  (R. at 222-35.)  During each visit, Plaintiff reported hearing others' thoughts about him and expressed concern that they could hear his thoughts.  (*Id.*)  On January 22, 2008, he reported no real improvement in his symptoms, and his "telepathy [was] just getting further away from home."   (R. at 235.)  He was sober and leaving school.  (*Id.*)  His concentration ability had improved from "poor" to "fair," but his motivation, energy, and activity levels had declined to "poor."  (*Id.*)  Dr. Feele's impression of Plaintiff was that he was "psychotic" and had a GAF score of 40.  (*Id.*)

On February 12, 2008, Plaintiff reported concern that his thoughts were being broadcast, but

---

[3]  GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 40 to 50 represents serious symptoms, such as suicidal ideation and severe obsessional rituals, or a major impairment in several areas, such as work and school.  *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-TR") p. 34 (4th ed. 1994).

he was not as concerned about hearing other people's thoughts. (R. at 234.) He also reported "definite progress," but his mood was low, and he remained isolated. (*Id.*) No significant changes were noted. (*Id.*) Dr. Feele added Haldol 5mg to his medication regimen. (*Id.*) On June 10, 2008, Plaintiff reported experiencing much better mood and more energy but was still isolated. (R. at 228.) His GAF score was 50. (*Id.*) Dr. Feele "reluctantly agreed" to reduce the dosage of Plaintiff's psychotrophic medication. (*Id.*)

On September 12, 2008, Plaintiff and his mother both reported that he was doing "much better." (*Id.*) He was going back to school, getting out of the house, and being more social, and he denied experiencing delusions. (*Id.*) Dr. Feele noted that he still appeared "blunt and suspicious," however. (*Id.*) His GAF had improved to 60. (*Id.*) On November 7, 2008, he noted as being "a bit guarded," but he reported doing well, going to school and work, and being compliant with his medication, and he denied any psychosis. (*Id.*) His mother was worried that he was not taking his medication daily because he had been "more oppositional" and was sleeping irregularly. (*Id.*)

On November 28, 2008, Plaintiff's parents took him to the emergency room (ER) because he was vomiting after excessive drinking of alcohol. (R. at 336-39.) Plaintiff admitted to some marijuana abuse, and his parents reported him having "some minor hallucinations. (R. at 337.)

On December 7, 2008, Plaintiff was involuntarily committed for four days at Green Oaks Hospital (Green Oaks) after his parents filed a mental inquest warrant due to his aggressive behavior, suicidal thoughts, and noncompliance with prescription medication. (R. at 239-40.) He reported having "general life issues" and would pound his fist on a desk when experiencing episodes of aggression. (R. at 239.) He was initially diagnosed with psychosis, depression, alcohol and cannabis abuse, and had a GAF score of 20. (*Id.*) It was noted that Plaintiff was not improving and

would need to be transferred to another hospital for further medication management. (*Id.*)

On December 11, 2008, Plaintiff was transferred to Terrell State Hospital (Terrell) for extended psychiatric inpatient treatment. (R. at 248-91). He was seen by Erik Blois, M.D., for a psychiatric evaluation. (R. at 257-62.) Plaintiff stated that he started having troubles with telepathy and mental voices back in 2007. (R. at 257.) He denied any neurovegetative symptoms of depression, but admitted to purchasing a gun with thoughts of suicide. (*Id.*) He used marijuana daily but was unwilling to take any of his medication. (R. at 258.) School and work stressed him out, and considered his boss intolerable and his main stressor. (*Id.*) Dr. Blois assessed Plaintiff as a mild risk for suicide. (R. at 260.) His presumptive diagnoses was paranoid-type Schizophrenia, cannabis abuse, and chronic mental illness with a current GAF of 25-30. (R. at 262.) Dr. Blois recommended that Plaintiff remain hospitalized for two weeks. (*Id.*)

Dr. Blois also conducted Plaintiff's mental status examination. (R. at 512-13.) Plaintiff was anxious, somewhat fidgety, and talkative, and he had a euthymic mood and flat affect. (R. at 512.) His thought process was circumstantial and he was positive for auditory hallucinations. (*Id.*) Plaintiff had intact concentration and intact immediate, recent, and remote memory. (*Id.*) Dr. Blois also noted that Plaintiff had impaired abstractions, poor judgment, and fair insight, and he estimated that Plaintiff had average intellectual functioning. (R. at 512-13.)

Plaintiff was discharged from Terrell on December 19, 2008. (R. at 285.) He reported being free of auditory hallucinations and acknowledged that they were symptoms and not instances of mental telepathy. (R. at 287.) He was observed as being calmer and having well-contained anxiety. (*Id.*) His discharge diagnoses were Bipolar I disorder with hallucinations, cannabis abuse, Schizophreniform psychosis, and problems with substance abuse and treatment non-compliance with

a GAF of 45.  (R. at 285.)

On December 29, 2008, Plaintiff established outpatient psychiatric treatment with Alcohol and Drug Abuse Prevention Training (ADAPT).  (R. at -329.)  His diagnoses were bipolar type, schizophrenia disorder, and cannabis abuse.  (R. at 329.)  His parents reported that he was doing better since his hospitalization, but he would become irritable and talk about suicide "when off his medications."  (*Id.*)

On January 22, 2009, Plaintiff was evaluated by Ehireme Ibazebo, M.D., at ADAPT. (R. at 324-27.)  Plaintiff reported "doing alright," but continued hearing voices.  (R. at 324.)  He was still seeing things and felt that his thoughts were being controlled by others. (*Id.*)  He reported having a depressed mood for a few days and experiencing suicidal ideation.  (*Id.*)  During a mental status examination, Dr. Ibazebo observed Plaintiff as being calm, cooperative, open, and euthymic; his affect was blunted and his thought process was "sometimes illogical."  (R. at 326.)  He had bizarre delusions, including thought broadcasting, thought insertion, and thought control. (*Id.*) Plaintiff was oriented with intact memory and good concentration, his intelligence was "average," and his insight and judgment were "good."  (*Id.*)  Plaintiff had a GAF score of 39. (R. at 327.)

Clinical notes from Dr. Ibazebo reveal improvements in Plaintiff's mental condition through June 2010.  (R. at 300-23.)  On March 13, 2009, he reported that his depression had stopped, but he continued hearing voices a few times a day. (R. at 320.)  On April 10, 2009, he reported doing well at his job.  (R. at 318.)  He was doing well overall and his job was going "great" on May 12, 2009. (R. at 316.)  Plaintiff continued to report that he was doing fine, good, or great during each of his other sessions with Dr. Ibazebo.  (R. at 310-15.)  He was noted as experiencing "intermittent" auditory hallucinations throughout this period.  (*Id.*)  On June 14, 2010, Plaintiff reported doing

6

"fine" and that he would be starting full-time hours at his job. (R. at 300.) Dr. Ibazebo reported that he was not depressed, and his cannabis abuse was in early remission. (R. at 300-01.)

On November 16, 2010, Plaintiff presented to clinical psychologist Dale General, Ph.D., for a psychology evaluation. (R. at 330-35.) Plaintiff complained that his medication was affecting his sleep schedule, but stated that "right now everything is pretty good on the meds" and his "hallucinations are pretty rare now." (R. at 330.) Dr. General noted that Plaintiff had been working as a server, cashier, and bus boy for a pizza restaurant for the past eighteen months. (R. at 331.) Plaintiff worked approximately twenty-five hours per week and the job was going well. (*Id.*) He stated that a year ago he would smoke marijuana once or twice per week. (*Id.*) When asked about his daily activities, Plaintiff stated that he would watch television and play video games during his free time and primarily socialized with his family and co-workers. (*Id.*) Dr. General noted that Plaintiff's ability to handle day-to-day stress appeared generally intact, and he was capable of independently setting goals and making plans. (*Id.*) He reported that Plaintiff was able to manage his own finances and handle financial transactions. (*Id.*)

Plaintiff stated that he had friends but currently preferred to interact with his family and co-workers. (R. at 332.) He did not have difficulty relating to his supervisors or people of authority in job situations. (*Id.*) Dr. General noted Plaintiff as appearing lucid, and he could read, write, follow instructions, and utilize a telephone. (*Id.*) Plaintiff's mood was euthymic and his psychomotor behavior was within normal limits. (*Id.*) Dr. General reported that Plaintiff was able to remain on-task throughout testing without difficulty, and assessed his abstract reasoning at the ninety-fifth percentile. (*Id.*) He also reported that Plaintiff's memory functioning was at the ninety-first percentile. and he had intact judgment and insight. (R. at 333.)

Dr. General opined that Plaintiff's history of depressive symptoms and auditory hallucinations was consistent with the diagnostic criteria for Schizoaffective Disorder, Depressed Type. (R. at 333.) His current GAF score was 65, and his "prognosis for continued improvement in symptoms [was] fair given compliance with appropriate treatment." (*Id.*) Dr. General concluded that Plaintiff would be capable to handle any funds due to him and would understand the meaning of filing for benefits. (R. at 334-35.)

On May 26, 2015, State Agency Medical Consultant (SAMC) Thomas Geary, Ph.D., conducted a consultative evaluation of Plaintiff's medical records. (R. at 79-82.) He opined that Plaintiff's schizoaffective disorder and bipolar disorder were medically determinable impairments, but were not severe. (R. at 80-81.) Dr. Geary concluded that the medical evidence did not support Plaintiff's disability claim during the time frame between December 1, 2007 and December 31, 2012. (R. at 81.) On August 6, 2015, SAMC Susan Posey, PsyD., affirmed Dr. Geary's opinion upon reconsideration of the medical evidence. (R. at 89-92.) Neither SAMC performed a mental residual functional capacity assessment on Plaintiff. (*See* R. at 81, 92.)

### 3.    Hearing Testimony

On September 20, 2016, Plaintiff, his mother, and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 34-75.) Plaintiff was represented by a non-attorney representative. (R. at 36, 99.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he had lived with his parents from 2007 until 2015 and was currently living on his own. (R. at 44.) He had a driver's license and did not have any driving restrictions between 2009 and 2012. (*Id.*) He graduated high school in 2006 and attended college immediately

after graduation.  (R. at 44-45.)  He was a full-time student but dropped out of college before the spring of 2008 semester because of mental health issues.  (R. at 46.)  He eventually went back to school, taking part-time classes at a local community college.  (*Id.*)  He did not remember when he returned to school, but his last semester was around 2012.  (R. at 47.)  From 2009 to 2011, Plaintiff worked part-time as a cashier and busser at a pizza shop. (R. at 48.)

Plaintiff did not know what might have triggered his depression or psychotic break in 2008, and he denied experiencing any trauma.  (R. at 50.)  He began hearing voices and would have problems with his college roommate.  (*Id.*)  When he came home from college, he started receiving outpatient treatment with Holiner.  (R. at 51.)  He was prescribed medication to treat his hallucinations, but he still heard voices the entire time through 2012.  (R. at 52.)  Despite those hallucinations, he would go to community college and did not have any trouble with people at school.  (*Id.*)  He agreed that he received special accommodations for his mental issues but eventually dropped out of school because he was not doing well in his classes.  (R. at 53.)  He was frustrated with school and not being able to concentrate.  (*Id.*)

Plaintiff testified that he did "pretty well" when he started seeking treatment with ADAPT.  (R. at 54.)  He recalled being hospitalized because of his mental issues.  (R. at 54-55.)  When he worked at the pizza shop from 2009 to 2011, he was offered a full-time position as a cook, but declined the position because it seemed stressful.  (R. at 55-56.)  He admitted to experiencing some stress dealing with customers and managing the register in his part-time role.  (R. at 56-57.)

### b.      Mother's Testimony

Plaintiff's mother testified that Plaintiff "came home from college psychotic" in December of 2007, and lived with her and her husband through the end of 2012.  (R. at 58.)  His college

roommate's mother told her that Plaintiff would act psychotic and had violent outbursts in the room. (R. at 59.) She took him to Holiner and was told that he probably had schizophrenia, but it could not be confirmed without further testing. (R. at 59-60.) Plaintiff received treatment at Holiner for a year and then established treatment with ADAPT in January of 2009. (R. at 60.) He did not appear to be psychotic before they obtained a health warrant to hospitalize him at Terrell, but he was very agitated and aggressive and would be physical with people at home. (R. at 61.)

From 2009 to 2011, Plaintiff received treatment with ADAPT, and he told her that he was ready to go back to school. (R. at 62.) He said he was taking classes at community college, but she was not sure if he actually went to school. (*Id.*) She knew that Plaintiff worked part-time at a pizza parlor, but was not sure why he stopped working there. (R. at 65-66.) Plaintiff's mother did not think he could meet the mental demands of a full-time job in 2012 because he was still dealing with a lot of aggression and anger. (R. at 66-67.) He did not "interact well with people and when he[] reached his limit, you would know about it." (R. at 67.) The family would not know what would trigger him, and living with him was like "walking on eggshells." (R. at 67.) Plaintiff would help her with the housework, like cooking and cleaning in the kitchen. (*Id.*) When he did not want to help and started being aggressive, he would go to his room. (*Id.*) The family would avoid communicating with him in 2012 to avoid arguments. (R. at 68.)

### c.    *VE's Testimony*

The VE testified that Plaintiff's past work experience as a fast food worker was classified in the *Dictionary of Occupational Titles* (DOT) as light, unskilled work with an SVP of 2. (R. at 71.) She opined that a hypothetical individual of the same age, education, and past work experience as Plaintiff could not perform his past work if the individual had no exertional limitations, but was

limited to understanding, remembering, and carrying out simple tasks and instructions, and having only occasional interaction with co-workers and supervisors and no public interaction. (*Id.*) The hypothetical person could perform the following jobs: laundry worker (medium, unskilled, SVP-2), with 500 jobs in Texas and 7,000 in the nationally economy; cleaner (light, unskilled, SVP-2), with 9,200 jobs in Texas and 134,300 in the nationally economy; and hand packager (medium, unskilled, SVP-2), with 2,300 jobs in Texas and 40,300 in the nationally economy. (R. at 71-72.) If the hypothetical person would be off task approximately 15 percent of the day beyond normal breaks due to psychologically based symptoms, no other competitive employment would be available for that level of off-task behavior. (R. at 72-73.)

The VE's testimony about time off task, tolerance, and absenteeism in the workplace was based on her education and experience. (R. at 73.) Individuals working unskilled jobs at the SVP-1 and SVP-2 levels would not be able to maintain competitive employment even if they were off task ten percent of the time. (*Id.*) If they were missing two or more days per month, regardless of the reason, it would be difficult for them to maintain employment. (R. at 73-74.) The DOT does not address off task behavior or time off work, but her testimony was consistent with it. (R. at 74.)

## C. ALJ's Findings

The ALJ issued his decision on December 13, 2016. (R. at 19-28.) He first considered Plaintiff's request to escalate and consolidate his May 28, 2015 Title XVI application for SSI benefits that was still pending state agency determination, with his February 28, 2015 Title II application for DIB benefits that had been denied initially and upon reconsideration. (R. at 19-20.) He determined that no common issue existed because the SSI claim did not share any overlapping period of time with his DIB claim and dismissed and remanded the SSI claim for state agency

11

determination.  (R. at 20.)

With respect to Plaintiff's DIB claim, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of December 1, 2007, through the date last insured of December 31, 2012.  (R. at 22.)  At step two, the ALJ found the following severe impairments: bipolar disorder, schizoaffective disorder, major depressive disorder, and marijuana dependence.  (*Id*.)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 24.)  Next, the ALJ determined that through the date last insured, Plaintiff retained the RFC to perform a full range of work at all exertional levels, but was only able to understand, carry out, and remember simple tasks and instructions, with no more than occasional interaction with co-workers and supervisors, and no contact with the general public.  (R. at 25.)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work.  (R. at 27.)  At step five, the ALJ found that  through the date last insured, considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could have performed.  (R. at 27.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from December 1, 2007 through December 31, 2012.  (R. at 28.)

## II.  ANALYSIS

### A.    Legal Standards

#### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. at § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.    Circuit law holds that an ALJ . . . cannot derive a residual functional capacity
      without the support of a medical opinion—because an Administrative Law
      Judge cannot determine the effects a claimant's condition has on the ability
      to work. The State Agency Medical Consultants gave no opinion on the
      effects of [Plaintiff's] mental impairment had on his ability to work. Was the
      ALJ's RFC supported by substantial evidence?

2.    The Commissioner failed to make finding of fact and decisions as to the
      rights of [Plaintiff's] application for payment under the Social Security Act.

(doc. 16 at 6-7.)

### IV.  SSI CLAIM[4]

Plaintiff contends that the ALJ improperly refused to consolidate his DIB and SSI claims into

a single hearing.  (doc. 16 at 24.)

Under 20 C.F.R. § 404.952, a claimant requesting a hearing before an ALJ on a DIB claim

may also request consideration of a separate SSI claim provided that "one or more of the issues to

be considered at the hearing" are shared by both claims.  20 C.F.R. § 404.952(a).  An ALJ can

consolidate and have a hearing on both claims, even if an initial or reconsidered determination has

not been made on one of the claims.  *Id.* § 404.952(a)(ii)(2).  The Social Security Administration

(SSA) has issued guidance for the consideration of separate claims by a claimant that have a

"common issue," but are in different stages of the application process.  *See* the Hearing Appeals and

_____

[4]  Because the ALJ dismissed the SSI claim before considering Plaintiff's DIB claim, the second issue will be
considered first.

Litigation Law Manual (HALLEX) § I-2-2-22.  If a claimant has a claim pending before an ALJ and a different claim pending at the initial or reconsideration level, and the claims share a common issue, the Field Office (FO) will ask the ALJ to consider joining the claims.  *Id.*  "A common issue is present when two or more claims, in any combination, share any overlapping period of time, and all have the same medical or substantial gainful activity issue." *Id.* (*citing* Soc. Sec. Admin., Program Operations Manual System ("POMS"), DI 12045.010 *Processing Disability Claims at Different Levels of Appeal, Title II and Title XVI – Common Issue Cases*).  The ALJ will "generally accept" the FO's request to escalate and consolidate claims, but may decline if: (1) the ALJ does not agree that a common issue exists; (2) the ALJ does not find it appropriate to join the claims "for other reasons;" or (3) the claimant objects to joining the claims.  *See* HALLEX § I-2-2-22.

Here, the ALJ noted that Plaintiff filed a DIB application on February 28, 2015, alleging disability beginning December 1, 2007, that was denied initially and upon reconsideration.  (R. at 19.)  Plaintiff filed a SSI application on May 28, 2015, and even though no reconsideration determination had been made, the FO escalated it with the DIB claim for adjudication and review.  (*Id.*)  The ALJ found that the DIB claim had a relevant disability period of December 1, 2007 through December 31, 2012, while the disability period for the SSI claim would have been on and after the date of his SSI application, which was "on May 28, 2015, or an unstated date in May 2015."  (R. at 20.)  Finding that the SSI claim did not share any overlapping period of time with his DIB claim, the ALJ concluded that no common issue existed and rejected the request to escalate it. (*Id.*)

Plaintiff argues that even though the last date insured for DIB benefits was December 31, 2012, if the ALJ had ultimately determined that he was disabled, the ALJ would have also considered whether his disability continued through the date of the decision.  (doc. 16 at 23.)

Because the date of the ALJ's decision would have been after Plaintiff filed for SSI benefits, Plaintiff argues that an overlapping time period is present, and the ALJ erred by prematurely dismissing the SSI claim before reaching a decision on the DIB claim. (*Id.* at 23-24.) The Commissioner responds that because the ALJ has the discretion to award DIB benefits for a "closed period"[5] rather than through the date of his decision, his dismissal of the escalated SSI claim was still appropriate. (doc. 17 at 8.) She also contends that the ALJ's finding of no overlapping period is consistent with Agency policy, which provides that an overlapping period is present for Title II and Title XVI claims when "Title II insured status is met in or after the month of filing for Title XVI eligibility or payments . . . ." (*Id.* at 9 (citing POMS DI 12045.010(A)(1)(a)).)

The ALJ's decision to reject the escalation of Plaintiff's Title XVI claim complied with agency rules and guidelines. *See* HALLEX § I-2-2-22. He determined that a common issue did not exist based on his finding that no overlapping time period existing with the DIB and SSI claims. (R. at 20.) Because Plaintiff filed his Title XVI application approximately thirty months after his Title II insured status expired, the ALJ did not err in finding no overlapping period and no common issue between the DIB and SSI claims. *See* POMS DI 12045.010. Moreover, at the hearing, the ALJ expressed "other reasons" why he declined to consolidate the claims, explaining that he was not comfortable considering both claims concurrently given the two and one-half year gap between the date last insured and the protective filing date of Plaintiff's SSI claim because he would be "basically flying blind without DDS giving . . . a decision, an opinion as of something recent" with respect to the medical evidence beyond the last insured date. (R. at 38.) The ALJ properly exercised

---

[5] *See, e.g., Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002) (defining a "closed period" as where "a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of [the ALJ's] decision").

his discretion in rejecting the escalation of Plaintiff's SSI claim.  *See* HALLEX § I-2-2-22.  Because the ALJ's decision did not violate HALLEX or any other Agency rules and procedures, remand is not required on this basis.

## V.  RFC ASSESSMENT

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. (doc. 18 at 8, 20.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. at § 404.1545(a)(1).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. at § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if he

does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to perform full range of work at all exertional levels with the following nonexertional limitations: understand, carry out, and remember simple tasks and instructions; have no more than occasional interaction with co-workers and supervisors; and have no contact with the general public. (R. at 25.)

### A.    <u>Lay Opinion</u>

Plaintiff argues that the RFC is not supported by medical opinion evidence, but wholly based on the ALJ's lay interpretation of raw medical data in violation of *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995). (doc. 16 at 16-22.) The Commissioner responds that substantial evidence supports the ALJ's RFC assessment and the mental limitations contained therein. (doc. 17 at 6-8.)

19

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. *Ripley*, 67 F.3d at 552. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the ALJ's RFC determination was not supported by substantial evidence. *Id.* The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557–58. Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27; *see also Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003).

Here, the ALJ did not explain how he determined that Plaintiff was able to understand, carry out, and remember simple tasks and instructions, with no more than occasional interaction with co-workers and supervisors, and no contact with the general public. (*See* R. at 25.) He considered Plaintiff's longitudinal medical records and noted that his psychotrophic medications had been relatively effective in controlling his symptoms. (R. at 26.) He also referenced the clinical notes from his inpatient psychiatric treatment, which indicated that Plaintiff's psychotic episode was precipitated by an extended period of medication noncompliance. (*Id.*) None of that medical

evidence addressed the effects of Plaintiff's conditions on his ability to work, however. *See Browning*, 2003 WL 1831112, at *7 (finding despite the fact that there was a vast amount of treating sources' medical evidence in the record establishing that plaintiff suffered from certain impairments, including voluminous progress reports, clinical notes, and lab reports, "none [made] any explicit or implied reference to effects these conditions h[ad] on claimant's ability to work" and the ALJ could not rely on that "raw medical evidence as substantial support for" the claimant's RFC).

Earlier in his decision, the ALJ referenced Dr. General's November 16, 2010 psychological consultative examination and his findings that Plaintiff "displayed a logical thought process, intact concentration, and an estimated above average intellectual functioning, and appeared fully oriented, with good reasoning." (R. at 23.) He also noted his GAF score of 65 as reflecting "only mild symptoms." (*Id.*) Nevertheless, the ALJ did not give any weight to Dr. General's opinion, nor to any other opinion by Plaintiff's other treating physicians. Further, Dr. General did not offer an opinion on the effects of Plaintiff's impairments on his ability to work; he only narrowly opined that Plaintiff was capable of managing his own funds and was able to understand the meaning of filing for benefits. (R. at 334-35.) "[E]vidence which merely describes Plaintiff's medical conditions is insufficient to support the ALJ's RFC determination." *See Turner v. Colvin*, No. 3:13-CV-1458-B, 2014 WL 4555657, at *5 (N.D. Tex. Sept. 12, 2014) (citing *Ripley*, 67 F.3d at 557).

Additionally, the SAMCs found insufficient evidence that Plaintiff presented with a severe medically determinable impairment during the applicable disability period, and did not offer an opinion on his functional abilities. (R. at 81, 92.) Though the ALJ gave little weight to their opinions, he did not identify an acceptable medical source that supports his RFC determination. (R. at 26-27.) While the ALJ may choose to reject the opinions of the SMACs, "he cannot

21

independently decide the effects of Plaintiff's . . . impairments on his ability to work, as that is expressly prohibited by *Ripley*." *Shugart v. Astrue*, No. 3:12-CV-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar.13, 2013).

There are no medical opinions in the record regarding the effects Plaintiff's mental impairments had on his ability to work, particularly in the areas of understanding, remembering, carrying out instructions, and interacting with others, so the ALJ appears to have relied on his own interpretation of the medical and other evidence, which he may not do. *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("[a]n ALJ may not–without the opinions from medical experts–derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination). Consequently, substantial evidence does not support the mental aspect of the ALJ's RFC determination. *See Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination); *Davis v. Astrue*, No. 1:11 CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov.6, 2012) ("In formulating a claimant's RFC, the ALJ-a layperson-may not substitute his own judgment for that of a physician."), *adopted by* 2013 WL 28068 (N.D. Miss. Jan. 2, 2013).

**B.**     **Harmless Error**

Because "[p]rocedural perfection in administrative proceedings is not required" and a court

"will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his RFC.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam).  To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects his impairments had on his ability to work casts doubt onto the existence of substantial evidence supporting his disability determination.  *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).  The ALJ's failure to rely on a medical opinion in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the finding that he is not disabled.  *See Williams v. Astrue*, 355 F. App'x 828, 832 (5th Cir. 2009) (per curiam) (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in determining the RFC); *see also Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ's failure to rely on a medial opinion in determining the plaintiff's RFC).  Accordingly, remand is appropriate on this basis.

## VI.  RECOMMENDATION

The Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for further proceedings.

**SO RECOMMENDED**, on this 22nd day of April, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. at Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

24